UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KELY Y. ARBUCKLE,

   Plaintiff,

  v.

JAMES D. WILCOX, JOHN DOE, MAJOR
FREDERICKS, JOHNSON, CHARLES BEST,
MORGAN A. HUDSON, RANDY S.
PFISTER, LT. BROWN, TERRELL PORK,
GARRETT, JONES, ROBINSON, DAVID
GOMEZ, AKERRIA DANIELS,

   Defendants.

No. 20 CV 1419

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Kely Arbuckle, a former inmate at Stateville Correctional Center, sued fifteen Stateville employees, claiming they violated his federal constitutional rights and committed various state-law torts against him. He alleges, among other things, that the prison employees retaliated against him for refusing to provide false information about gang activity and denied him medical care in violation of his right against cruel and unusual punishment. Fourteen of the fifteen defendants moved to dismiss all ten counts.[1] The motion to dismiss is granted in part and denied in part.

## I. Standard of Review

A complaint must contain "a short and plain statement" showing that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[1] Defendant John Doe has not been identified or served with the complaint. The claims against him are not at issue here.

677–78 (2009). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At this stage, I accept all factual allegations as true and draw all reasonable inferences in Arbuckle's favor, disregarding legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Iqbal*, 556 U.S. at 678.

## II. Facts

Plaintiff Kely Arbuckle was an inmate at Stateville Correctional Facility when in 2017, he got into a fight with another inmate. [28] ¶¶ 1–2.[2] Arbuckle heard that the other inmate was "trash talking" him to others and calling him "a bitch." *Id.* ¶ 5. Before getting physical, Arbuckle asked the other inmate, "who are you calling a bitch?" *Id.* The other inmate responded, "I'm calling you a bitch," and Arbuckle punched him. *Id.* The other inmate responded in kind; he threw Arbuckle against a fence and punched him "around the head and body." [28-1] at 1. A nearby guard told them to stop fighting. When they didn't, the guard pepper sprayed and handcuffed them. *Id.* at 1–2.

On the same day as the fight, Arbuckle was charged with four offenses: violating various Department of Corrections rules, including "dangerous disturbances," fighting, disobeying a direct order essential to safety, and "violation of rules." [28-2] at 1. Also on that day, Arbuckle was interrogated by Defendant James

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the second amended complaint, [28], and its corresponding exhibits.

Wilcox about the cause of the fight. [28] ¶ 5. Arbuckle explained that he'd punched the other inmate for calling him a "bitch," *id.*, but Wilcox was unpersuaded. *Id.* ¶ 6. "[W]ho ordered the assault on [the other inmate]?" Wilcox asked. *Id.* Arbuckle reiterated that it was a personal dispute—no one had ordered it. *Id.* But Wilcox "grew increasingly impatient and frustrated" with Arbuckle's explanation, and told Arbuckle that if he didn't say the fight was gang-related, Wilcox would file additional charges of assault and gang activity against him. *Id.* ¶ 7.

About a week later, Arbuckle appeared before the Adjustment Committee (which adjudicates disciplinary charges) on three of the four charges. *Id.* ¶ 8. He pled guilty to two charges, fighting and disobeying an order, and was found not guilty of dangerous disturbance. *Id.* The Adjustment Committee gave Arbuckle 1) one month of C-grade status, 2) one month of segregation, and 3) one month of commissary restriction. *Id.* Arbuckle was served with the Adjustment Committee's Final Summary Report ten days after the hearing and twelve days before his one month in segregation was supposed to end. *Id.* ¶ 9. (Arbuckle had already been placed in segregation by the time the Adjustment Committee found him guilty, so his one month of segregation included time served. *See id.* ¶¶ 8–10.)

On the day Arbuckle was supposed to get out, though, he was instead served with two new charges of assault and gang activity—the exact charges Wilcox had promised. *Id.* ¶¶ 11–12. Correction Officer Johnson served the charges on Arbuckle. As she did, she told him, "Wilcox said to tell you he keeps his promises, so here's another ticket for assault and STG [Security Threat Group, used to describe gang

activity], so you're not getting out of seg." *Id.* ¶ 11. Officer Wilcox then put Arbuckle in temporary confinement, *id.* ¶ 14, where he would stay until January 14, 2018. *Id.* ¶ 33.

Arbuckle testified at an Adjustment Committee hearing on the charges. *Id.* ¶ 17. He told the Committee that he had already been charged for the same offense, that Wilcox filed his charges more than 30 days after the underlying incident (violating IDOC policy), and that the charges were filed in retaliation for Arbuckle's unwillingness to provide false information to Wilcox. *Id.* Arbuckle also asked that the Committee interview the confidential sources who had allegedly provided the basis for the two new charges, as well as the gang leader who, according to Wilcox, ordered the assault. *Id.* But the Committee Chairman told Arbuckle that the alleged gang leader was no longer at Stateville and thus was unavailable to testify. *Id.* The Adjustment Committee found Arbuckle not guilty of assault but guilty of gang activity. *Id.* ¶ 18. For that offense, Arbuckle received 1) three months of C grade, 2) three months of segregation, 3) three months of commissary restriction, and 4) six months of visitation restrictions. *Id.*

Roughly a month after the second Adjustment Committee hearing, Arbuckle timely filed a grievance requesting that the hearing results be expunged because the inmate disciplinary report was served on him more than eight days after the offense and the Adjustment Committee hearing began more than fourteen days after the offense—both violations of Department of Corrections rules. [28-5] ¶¶ 3–4, 6, 10. Arbuckle also argued that a finding of guilt on the gang-activity charge was

predicated on a finding of guilt on the assault charge. Because he was found not guilty of assault, he could not be found guilty of gang activity. *Id.* ¶ 2 of conclusion.[3]

About two weeks after Arbuckle filed that grievance, the grievance officer recommended that the finding of guilt on the gang-activity charge be expunged, [28] ¶ 19, because it "appear[s] the grievant was charged twice for the same incident." [28-6] at 3. The Chief Administrative Officer received the expungement recommendation a week after it was filed and agreed with the recommendation. *Id.* The Administrative Review Board received the Chief Administrative Officer's agreement five months after it was filed. *Id.*

Around the same time the grievance officer was recommending expungement (but before Arbuckle was informed of the expungement recommendation), Arbuckle wrote a letter to Deputy Director Robinson explaining his situation and telling Robinson that this wasn't anomalous for Stateville. [28] ¶ 20. Specifically, Arbuckle said that it's not unusual for Stateville officials to retaliate against inmates by, for instance, filing false gang-activity charges; issuing investigative reports more than eight days after the underlying offense; falsely claiming that gang members have been transferred out of Stateville to keep them from testifying at inmates' Adjustment Committee hearings; and having supervisors sign off on holding inmates in temporary confinement, even when those supervisors know that the inmates are

---

[3] Arbuckle did not argue that the finding of guilt on the gang-activity charge was improper because it was based on the same incident as his previous charges. But that fact—and not violation of DOC rules or Arbuckle's necessary-predicate argument—was the reason the grievance officer would later recommend expungement of the gang-activity charge. [28-6].

being kept in confinement in violation of DOC rules and due process. *Id.* Arbuckle never received a response. *Id.*

A few days after writing that letter, Arbuckle received a copy of the grievance officer's expungement recommendation. *Id.* ¶ 21. The day after that, during the morning count, Arbuckle showed the recommendation to officers and told them he should no longer be in segregation. *Id.* ¶ 22. Arbuckle asked Officers Garrett and Jones five times that day when he would be released. They told him they would notify Sgt. Pork and Lt. Brown of the expungement. *Id.* That same day and at Arbuckle's request, another inmate asked Pork and Brown why Arbuckle wasn't being released. *Id.* ¶ 23. Pork and Brown said they knew about the expungement, but that it was an issue between Arbuckle and Internal Affairs. *Id.* Arbuckle himself then talked to Pork and Brown, showed them the expungement, and asked to be released. *Id.* ¶ 24. Pork and Brown told Arbuckle they'd been instructed by Internal Affairs not to release him. *Id.*

About half an hour after learning that he wouldn't be released from segregation, Arbuckle had a severe panic attack. *Id.* ¶ 25. He asked Officers Garrett and Jones for a crisis team, but they ignored his request. *Id.* About two hours after the panic attack began, Akerria Daniels, a Stateville mental health provider, "[p]assed by Arbuckle's cell on her way to tend to another inmate." *Id.* Arbuckle asked Daniels for a crisis team. *Id.* Daniels made eye contact with Arbuckle but walked away. *Id.* As she did, Garrett told Arbuckle, "IA is keeping you here." *Id.*

About ten minutes after Daniels passed by, Arbuckle lost consciousness. *See id.* ¶ 26. He was unconscious for twenty minutes; other inmates screamed for a med-tech, but nobody came. *Id.* When Arbuckle was finally awakened by another inmate, he was on the floor of his cell "trembling and shaking uncontrollably." *Id.* Twenty minutes after Arbuckle woke up, Pork and Brown came to his cell and laughed at him. *Id.* Brown told Arbuckle, "[W]ell, you're still alive." *Id.* According to an affidavit from another inmate who saw the interaction, either Pork or Brown (the affidavit does not specify which) also told Arbuckle, "Wilcox told us he's keeping you in seg, so you'll have to kiss his ass to get out," and laughed out loud. [28-13] at 2. They then mockingly repeated the phrase, "Arbuckle needs a med-tech." *Id.* When Arbuckle again asked for one, Brown said, "try the next shift, see if they'll get you a med-tech," and walked away.[4] [28] ¶ 26. Arbuckle never received medical help. *Id.*

About an hour after Brown and Pork left his cell, Arbuckle showed the expungement recommendation to two other corrections officers (neither of whom is named as a defendant) and asked why he hadn't been released yet. *Id.* ¶ 27. One of them told him, "[W]e all know about this, and nothing is happening today." *Id.*

The day after, Arbuckle told yet another corrections officer (who is not named as a defendant) about his expungement. *Id.* ¶ 29. That officer told Arbuckle that he couldn't release him; the decision was up to Brown. *Id.*

---

[4] James Glazier, a fellow inmate who provided an affidavit about the interaction, [28-13], said he heard, "cry to the next shift."

A few days later, Arbuckle asked Brown if he could call his mother and daughter for Christmas. *Id.* ¶ 30. Brown denied the request and told Arbuckle Internal Affairs didn't want him using the phone. *Id.*

Three weeks later, Arbuckle was finally released from segregation. *Id.* ¶ 34. His release came roughly two months and three weeks after his original release date.

## III.   Analysis

### A.   Retaliation

Arbuckle claims that defendants kept him in solitary confinement for three months beyond his initial release date to retaliate against him for not providing false information to Wilcox. [28] ¶ 57. A plaintiff bringing a First Amendment retaliation claim must show that: 1) he was exercising a First Amendment right, 2) he suffered a deprivation that is likely to deter exercise of that right in the future, and 3) his "First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

#### 1.   *First Amendment Activity*

Because this case is at the motion-to-dismiss stage, I accept as true Arbuckle's allegation that the information Wilcox was requesting was false and that Wilcox knew it to be false. So the first question is whether Arbuckle's refusal to provide false information to Wilcox is protected activity under the First Amendment. And whether a prison inmate's speech is protected depends on its relationship to the prison's legitimate penological interests. *Bridges*, 557 F.3d at 551 (applying *Turner v. Safley*, 482 U.S. 78, 89 (1987), to determine whether inmate alleged protected speech).

8

Providing truthful information to an internal prison investigation is consistent with legitimate penological objectives and implicates the First Amendment. *Id.* (citing *Cornell v. Woods*, 69 F.3d 1383, 1388 (8th Cir. 1995)). Relatedly, then, refusing to provide false information may be protected too, *see Burns v. Martuscello*, 890 F.3d 77, 89 (2d Cir. 2018) (there is no penological interest in forcing an inmate to give false information), although refusing to provide truthful cooperation might not be protected. *See Clark v. Reed*, 772 Fed. App'x 353, 355 (7th Cir. 2019). Although the scope of the First Amendment protection applicable to Arbuckle's activity may not be clearly established, his refusal to lie to Wilcox and say that the assault was gang-related is at least a plausible allegation of protected activity.

2. *Deprivation*

Arbuckle alleges that defendants retaliated against him by keeping him in solitary confinement for more than the one month he was originally supposed to serve. [28] ¶ 57. Retaliation for First Amendment activity is unconstitutional "even if the retaliatory action itself does not amount to an independent constitutional violation." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020). The fact that there is generally no protected liberty interest in not being placed in segregation, *see Sandin v. Conner*, 515 U.S. 472, 486 (1995); *Holly v. Woolfolk*, 415 F.3d 678, 679 (7th Cir. 2005), is therefore irrelevant. *See Bridges*, 557 F.3d at 552.

A retaliatory action is sufficiently adverse if it is "likely [to] deter a person of ordinary firmness from continuing to engage in protected activity." *Holleman*, 951 F.3d at 880 (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). Being placed

9

in segregation (or, as is the case here, being kept in segregation) meets that standard. *See Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996).

### 3. *Motivating Factor*

Finally, Arbuckle must allege that his refusal to provide false information to Wilcox was at least a "motivating factor" in his being placed in segregation for an additional three months. *Woodruff*, 542 F.3d at 551. On this element, the complaint is clear: Wilcox told Arbuckle that if he didn't say the fight was gang-related, Wilcox would file additional charges against him. [28] ¶ 7. When Johnson delivered the additional charges to Arbuckle, she said, "Wilcox said to tell you he keeps his promises, so here's another ticket for assault and [gang-related activity], so you're not getting out of seg." *Id.* ¶¶ 11, 16. And after Arbuckle had a panic attack, Pork or Brown told him, "Wilcox told us he's keeping you in seg, so you'll have to kiss his ass to get out." [28-13]. These statements adequately allege that Arbuckle's First Amendment activity was the motivating factor in his being placed in segregation for three more months.

### 4. *Application to Individual Defendants*

Arbuckle alleges that every defendant named in his complaint is liable for retaliation. *See* [28] ¶ 57. But in order to have retaliated against Arbuckle for refusing to provide false information, a defendant had to have known in the first place that Arbuckle refused to provide false information. For eight of the defendants (Fredericks, Pfister, Gomez, Garrett, Jones, Robinson, Jacobs, and Daniels), Arbuckle has failed to allege this knowledge and so cannot make out a claim against them.

The remaining six defendants are Wilcox, Johnson, Best, Hudson, Pork, and Brown. As is clear from Wilcox's, Johnson's and Brown/Pork's comments, *id.* ¶¶ 7, 11, 16; [28-13], Wilcox filed additional charges against Arbuckle and placed him in segregation because he refused to provide false information. That would demonstrate knowing retaliation by Wilcox; the claim against him can proceed.

The other five defendants all knew about the retaliation, *see* [28] ¶¶ 11, 16 (Johnson), ¶ 17 (Best and Hudson); [28-13] at 1–2 (Pork and Brown), but not all of them participated in it. Start with Best and Hudson, the chair and committee member of the Adjustment Committee, respectively. Best and Hudson first learned that Wilcox had filed charges for retaliatory purposes at Arbuckle's second hearing, where Arbuckle testified to that effect. [28] ¶ 17. While Best and Hudson knew about Wilcox's retaliatory motives (or, at least, knew Arbuckle believed that Wilcox had retaliatory motives), they did not necessarily share those motives. Without more, it is hard to see how Arbuckle's refusal to provide false information to Wilcox was a motivating factor behind Best and Hudson's finding of guilt on the gang-activity charge.

The remaining three defendants—Johnson, Pork, and Brown—present a more difficult question. They aided Wilcox's retaliatory efforts by serving as his messengers, making clear to Arbuckle that his continued confinement was a punishment from Wilcox, *see id.* ¶¶ 11, 16; [28-13] at 1–2, and that Arbuckle wouldn't get out until he complied with Wilcox's demand. [28-13] at 1–2. But their conduct does not map onto a retaliation claim. They did not keep Arbuckle in segregation for

11

an additional three months—Wilcox did. In fact, there is no indication in the complaint that Johnson, Pork, or Brown had the power to keep Arbuckle in segregation or remove him from it. Without that ability, Johnson, Pork, and Brown's actions can't fulfill the second element of a retaliation claim.

I deny defendant Wilcox's motion to dismiss the retaliation claim and grant the other defendants' motions to dismiss that claim. Because Arbuckle may be able to state a claim against other defendants with more factual development, the dismissal is without prejudice.

### B. Denial of Due Process

Arbuckle says that defendants violated his due-process rights by depriving him of his right to call witnesses and present evidence at his second Adjustment Committee hearing. [28] ¶ 59. Specifically, Arbuckle says he asked the Committee to interview the confidential sources who had allegedly provided the basis for the two new charges, as well as the gang leader who Wilcox said ordered the assault. *Id.* (This alleged gang leader, Arbuckle would later learn, was David Ruiz. *Id.* ¶ 16.) The Committee Chairman, Charles Best, told Arbuckle that Ruiz was no longer at Stateville and thus was unavailable to testify.[5] *Id.* Arbuckle also claims that Wilcox lied in his disciplinary report about Ruiz's availability by claiming that Ruiz (whose identity was undisclosed in the report) had been transferred out of Stateville. *Id.*;

---

[5] The complaint does not say what Best said, if anything, about the other witnesses' availability.

[28-3]. Arbuckle says this detail in the report was intended to suggest that Ruiz would be unavailable to testify at the subsequent Adjustment Committee hearing. *Id.* ¶ 16.

An inmate alleging a violation of due process must show that "(1) he ha[d] a liberty or property interest that the state … interfered with,[] and 2) the procedures he was afforded upon that deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). If there is no underlying liberty or property interest at issue, the sufficiency of the procedure doesn't matter.

The focus of the liberty-interest inquiry is the "nature of the deprivation that a prisoner suffers." *Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997) (citing *Sandin*, 515 U.S. at 481–83). If the deprivation at issue "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," it implicates a liberty interest. *Sandin*, 515 U.S. at 484. Mandatory statutory or regulatory language does not create a liberty interest; what matters is the nature of the underlying deprivation. *See Thomas*, 130 F.3d at 760. Thus, even if defendants violated DOC regulations or Illinois law in their treatment of Arbuckle, they did not necessarily interfere with a protected liberty interest.

Arbuckle says that the Adjustment Committee's punishment for the finding of guilt on the gang-activity charge interfered with four liberty interests: the right 1) to not be demoted to a lower inmate status, 2) to not be placed in segregation, 3) to maintain commissary access, and 4) to maintain visitation access. *See* [28] ¶ 18.

### 1. *Demotion to C-Grade Status and Commissary Restrictions*

Not being demoted to a lower inmate status is not a protected liberty interest. *Thomas*, 130 F.3d at n.8 (citing *Whitford v. Boglino*, 63 F.3d 527 n.7 (7th Cir. 1995)). Nor are restrictions on commissary access. *Id.* (citing *Moore v. Pemberton*, 110 F.3d 22, 23 (7th Cir. 1997)) and *Madison v. Parker*, 104 F.3d 765, 768 (5th Cir. 1997)).

### 2. *Segregation*

In general, an inmate has no constitutional liberty interest in not being placed in segregation, *Sandin*, 515 U.S. at 486; *see also Higgason*, 83 F.3d at 809; *Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir. 1995). But there is an exception to this general rule: prisoners may have a liberty interest in not being put in segregation "if the conditions of confinement in segregation are significantly more restrictive than those in the general population." *Whitford*, 63 F.3d at 533. Arbuckle has not provided enough information to show that "the conditions of [his] confinement were significantly altered when he was placed in segregation" or that he suffered a "major disruption in his environment," *id.*, so I dismiss his segregation-related due-process claim without prejudice.

### 3. *Visitation Restrictions*

The Constitution does not create a liberty interest in prison visitation. *See Gavin v. McGinnis*, 866 F.Supp. 1107, 1110 (N.D. Ill. 1994) (citing *Kentucky Dep't of Corr.*, 490 U.S. at 461–62). It is true that Illinois law grants prisoners the right to receive visitors. 730 ILCS 5/3-7-2(f). But a state law's guarantee of a right does not make the right a federal constitutional liberty interest. *See Thomas*, 130 F.3d at 760; *Higgason*, 83 F.3d at 808–09.

Arbuckle's due-process claims are dismissed. Those related to demotion in status, commissary restrictions, and visitation restrictions are dismissed with prejudice. The claim related to segregation is dismissed without prejudice.

### C. Cruel and Unusual Punishment

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Deliberate indifference has objective and subjective elements. *Id.* at 653. On the objective element, Arbuckle must show that his panic attack was a "sufficiently serious" medical condition. *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A medical condition is sufficiently serious when it has been diagnosed by a doctor or "is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* A plaintiff does not need to show that he was in "pain or extreme distress" to prove that his medical condition was sufficiently serious. *See Foelker v. Outagamie Cnty.*, 394 F.3d 510, 513 (7th Cir. 2005).

Arbuckle had a "severe" panic attack after learning he wouldn't be released from segregation. [28] ¶ 25. While Arbuckle does not describe the symptoms he was experiencing when he told Garrett, Jones, and Daniels that he needed a crisis team, [28] ¶ 25, the fact that Arbuckle collapsed just ten minutes later, *id.* ¶ 26, suggests that he manifested an obvious need for medical attention. Arbuckle has alleged the objective element.

On the subjective prong, Arbuckle must prove that that defendants "kn[e]w of and disregard[ed] an excessive risk to inmate health." *Greeno*, 414 F.3d at 653. That

knowledge can be inferred "from the very fact that the risk was obvious." *Id.* (quoting *Farmer*, 511 U.S. at 842). Arbuckle hasn't shown that Wilcox, Johnson, Fredericks, Best, Hudson, Pfister, Gomez, Robinson, or Jacobs even knew about his panic attack as it was happening. But Brown, Pork, Garrett, Jones, and Daniels did. *See* [28] ¶¶ 25, 26. Arbuckle told Garrett and Jones around noon that he was having a panic attack. *Id.* ¶ 25. They ignored his request for a crisis team. Daniels, a mental-health provider, arrived at around 2 p.m., but she was there to see someone else. *Id.* In other words, Garrett and Jones had never called for medical help. And Daniels was no help to Arbuckle. When Arbuckle told her he needed a crisis team, she "made eye contact with [him], then callously walked away." *Id.*

At some point between 2 p.m. and 2:50 p.m., Garrett and Jones ended their shift and Pork and Brown began theirs. *See id.* ¶¶ 25–26. It is therefore unclear which officers were staffing segregation from 2:10 to 2:30, the twenty-minute period when Arbuckle was lying unconscious on the floor, as other inmates screamed for help. [28-13]. Whoever it was, they didn't answer. Twenty minutes after Arbuckle returned to consciousness, Brown and Pork went to Arbuckle's cell, laughed at him, and seemed to acknowledge that they knew what had happened. *See* [28] ¶ 26. "[W]ell, you're still alive," Brown told Arbuckle. *Id.* When Arbuckle again asked for medical help, Brown told him to "try the next shift." *Id.*

Garrett, Jones, Brown, and Pork all had the power to call for medical help and chose not to. Brown went a step further, and mocked Arbuckle's powerlessness. Daniels, meanwhile, saw Arbuckle just ten minutes before he collapsed. He asked her

16

for help—help that she was able to offer as a mental-health provider. Despite that, she turned around and walked away. If proven, those actions could constitute deliberate indifference.

The Eighth Amendment claims against Brown, Pork, Garrett, Jones, and Daniels acting in their individual capacities can proceed.[6] I dismiss without prejudice the claims against Defendants Wilcox, Johnson, Fredericks, Best, Hudson, Pfister, Gomez, Robinson, and Jacobs.

### D. *Monell* Failure to Train

Arbuckle also invokes a *Monell* failure-to-train theory under § 1983 against certain individual defendants. [28] ¶¶ 68–71. But that makes little sense. *Monell* allows plaintiffs to sue municipalities or municipal (but not state) officials (in their official capacities) for violation of constitutional rights, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–93 (1978); it is not a tool to sue state officials in their personal capacities. *See also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989) (states are protected by the Eleventh Amendment while municipalities are not). Arbuckle's *Monell* claim is dismissed with prejudice.

### E. Double Jeopardy

Arbuckle argues that his rights against double jeopardy were violated when: 1) Wilcox filed additional charges stemming from the same incident as the first

---

[6] Arbuckle's complaint refers to the defendants acting in their "individual, supervising and official capacity," [28] ¶ 66, but under 42 U.S.C. § 1983, a state official acting in his official capacity is not a "person" for purposes of retrospective monetary relief. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989). Any "official capacity" § 1983 claims are dismissed with prejudice.

charges, 2) the Adjustment Committee held a hearing on those charges, and 3) the Adjustment Committee found him guilty of the gang-activity charge. [28] ¶¶ 72–76.

Charging an inmate twice for the same disciplinary offense may very well be a violation of DOC rules, as the grievance officer's expungement recommendation suggests. *See* [28-6] at 3. But it is not cognizable as a Fifth Amendment Double Jeopardy claim. The Double Jeopardy clause does not prohibit successive prison disciplinary proceedings on the same offense. *See Meeks v. McBride*, 81 F.3d 717, 722 (7th Cir. 1996). Because "a prison disciplinary proceeding is no bar to a subsequent criminal prosecution for the same offense," a fortiori, a disciplinary proceeding cannot bar a subsequent disciplinary proceeding. *Id*.

Arbuckle acknowledges *Meeks* but argues that its rationale doesn't apply here. [63] at 7. In *Meeks*, the court worried that prohibiting successive disciplinary hearings would compromise institutional order. *Meeks*, 81 F.3d at 722. That's not relevant here, Arbuckle says, because Wilcox's charges were filed for retaliatory purposes and "served no legitimate penological interest." [63] at 7. But that factual difference is irrelevant to Double Jeopardy, which is unconcerned with the reason for subsequent charges, and instead creates a rule—a rule that doesn't apply in the prison disciplinary setting. Arbuckle's Double Jeopardy claim is dismissed. Because the insufficiency of the claim cannot be cured with further factual development, the dismissal is with prejudice.

### F. Failure to Intervene

Failure to intervene is not a stand-alone claim. It is, instead, a form of liability under § 1983. *See Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985). Instead of holding

18

a defendant responsible for acting with deliberate indifference to the plaintiff's constitutional rights, the failure-to-intervene theory holds a defendant responsible for failing to act, with deliberate indifference to the plaintiff's constitutional rights. *Id.* (citing *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). Defendants construe Arbuckle's failure-to-intervene claim as limited to retaliation. [56] at 9. If that reading is accurate, then Arbuckle's claim fails for the same reason that his retaliation claim failed against all defendants but Wilcox. Fredericks, Pfister, Gomez, Garrett, Jones, Robinson, Jacobs, and Daniels didn't know enough to intervene in the retaliation; Johnson, Pork, and Brown had the requisite knowledge but may not have had the ability to intervene (by removing Arbuckle from confinement).

But I read Arbuckle's failure-to-intervene theory to extend to his Eighth Amendment claim, and on this theory, Arbuckle has a stronger argument. Neither Brown, Pork, Garrett, Jones, nor Daniels was ever alone in the segregation unit. Each of them was always there with at least one other defendant whose conduct they could observe. If any one of these defendants is held liable for denial of medical care, the defendant who accompanied him—if not also held liable for denial of medical care— could at least be held liable for failure to intervene. This theory can apply against those five defendants, but it is dismissed without prejudice as to all other defendants, who lacked the requisite knowledge to intervene.

### G. Conspiracy on Civil Rights Claims

Arbuckle alleges that all of the defendants except Daniels "reached an agreement amongst themselves to deprive Arbuckle of his constitutional rights, to fabricate evidence, to produce false disciplinary reports, to persuade the Adjustment

Committee members to punish Arbuckle twice for the same incident, to maintain Arbuckle in solitary confinement despite his violation being previously expunged," and to conceal all of this misconduct. [28] ¶ 83. Because all the actors involved are state actors, there is no standalone § 1983 conspiracy claim; it is, like failure to intervene, a theory of liability for a substantive constitutional violation. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (conspiracy is not an independent basis of liability in § 1983 actions); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("[T]he function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint."). The § 1983 conspiracy claim is dismissed without prejudice as unnecessary. *See Scott v. City of Chicago*, 619 Fed. App'x 548, 549 (7th Cir. 2015) (where all members of alleged conspiracy were state actors, "a conspiracy claim ha[d] no role to play").

Moreover, the allegations of the complaint do not support a conspiracy theory of liability against any of the identified defendants. To establish conspiracy liability under § 1983, a plaintiff must show that the defendants reached an agreement to deprive the plaintiff of his constitutional rights, and a conspirator took an overt act in furtherance of that agreement, actually depriving the plaintiff of his rights. *See Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). There can be no conspiracy to deprive an individual of his constitutional rights unless his constitutional rights are actually violated. Here, as discussed above, Arbuckle's extended time in segregation did not, as currently alleged, implicate a protected liberty interest.

20

What's more, even assuming there was a deprivation of due process, there are no allegations of agreement beyond conclusory ones.

Arbuckle's allegation of conspiracy to retaliate comes closer to stating a plausible basis for liability. At least three of the defendants knew what Wilcox was up to. Johnson told Arbuckle, "Wilcox said to tell you he keeps his promises, so here's another ticket for assault and [gang-related activity], so you're not getting out of seg." [28] ¶¶ 11, 16. Pork or Brown ([28-3] does not specify which, though both were present) told Arbuckle, "Wilcox told us he's keeping you in seg, so you'll have to kiss his ass to get out." [28-13] at 1–2. But even drawing inferences in favor of plaintiff, these comments only show knowledge, not a meeting of the minds to join Wilcox's retaliation.

I dismiss the federal conspiracy claims without prejudice because additional factual development could reveal a conspiratorial agreement sufficient to impose liability under § 1983.

### H. Willful and Wanton Conduct

In addition to his federal claims, Arbuckle brings three state-law claims: negligent and willful/wanton conduct, intentional infliction of emotional distress, and civil conspiracy (presumably to commit willful and wanton conduct or intentional infliction of emotional distress). *See* [28] ¶¶ 86–97. Federal courts may exercise jurisdiction over state-law claims that are sufficiently related to the case's federal claims that they form "part of the same case or controversy." *See* 28 U.S.C. § 1367(a). So long as the state and federal claims share a "common nucleus of operative fact," I can exercise jurisdiction over the state claims. *See Green Valley Invs. v. Winnebago*

*Cnty.*, 794 F.3d 864, 869 (7th Cir. 2015) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 718, 725 (1966)). Arbuckle's state claims arise from the exact same incident as his federal claims; I therefore have jurisdiction.

Willful and wanton conduct is not an independent tort but is instead an "aggravated form of negligence." *Krywin v. Chi. Transit Auth.*, 238 Ill.2d 215, 235 (2010). Thus, to plead willful and wanton conduct, a plaintiff must first allege the elements of negligence: duty, breach, proximate cause, and injury. *See Kirwan v. Lincolnshire-Riverwoods Fire Prot. Dist.*, 349 Ill. App. 3d 150, 155 (2004). In addition, a plaintiff must allege either a "deliberate intention to harm" or an "utter indifference to or conscious disregard for the welfare of the plaintiff." *Doe ex rel. Ortega-Piron v. Chi. Bd. of Educ.*, 213 Ill.2d 19, 28 (2004).

Arbuckle alleges that defendants' retaliatory conduct and failure to provide him with medical care constitute willful and wanton conduct. *See* [28] ¶¶ 88–91. Wilcox's retaliation could very well be willful and wanton conduct. *See Rojicek v. Cmty. Consol. Sch. Dist. 15*, 888 F.Supp. 878, 885 (N.D. Ill. 1995). But Arbuckle runs into two problems with the other defendants: breach and proximate cause. In order to breach a duty to not retaliate, a defendant must act with retaliatory intent. As explained above, though, Arbuckle hasn't shown that Defendants Fredericks, Pfister, Gomez, Garrett, Jones, Robinson, Jacobs, and Daniels had that intent, or even knew that Wilcox had that intent. As to Defendants Johnson, Brown, and Pork, Arbuckle must show that they proximately caused his extended stay in segregation. Because

Arbuckle hasn't shown that they had the ability to remove him from segregation, he hasn't shown proximate cause.

Arbuckle fares better on denial of medical care. The "utter indifference" or "conscious disregard" standard for willful and wanton conduct is "remarkably similar" to the Eighth Amendment's deliberate-indifference standard. *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001) (quoting *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 n. 13 (7th Cir.1998)). Because of that similarity, willful-and-wanton-conduct claims rise and fall with Eighth Amendment claims. *See Hall v. Ryan*, 957 F.2d 402, 405 (7th Cir. 1992). Arbuckle has stated a claim that Brown, Pork, Garrett, Jones, and Daniels violated his right to be free from cruel and unusual punishment; he has therefore also stated a claim that those defendants engaged in willful and wanton conduct.

The willful and wanton conduct count is dismissed without prejudice as to Defendants Fredericks, Pfister, Gomez, Robinson, and Jacobs. It can proceed against Defendants Wilcox (for retaliation), and Brown, Pork, Garrett, Jones, and Daniels (for the failure to provide medical care).

## I. Intentional Infliction of Emotional Distress

A plaintiff alleging intentional infliction of emotional distress under Illinois law must prove three elements: 1) the defendant's conduct must have been "truly extreme and outrageous," 2) the defendant had to have intended for his conduct to cause severe emotional distress or, at least, had to have known there was a high likelihood that it would cause such distress, and 3) the conduct had to have actually caused such distress. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). If one of

these elements isn't met, there is no claim. The tort does not require a contemporaneous physical injury, *id.*, but the conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community." *Id.* (citing *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 21 (1992)). The "conduct must be such that the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim[:] Outrageous!'" *Id.* (quoting *Doe v. Calumet City*, 161 Ill.2d 374 (1994), *abrogated on other grounds by DeSmet ex rel. Estate of Hays v. Cnty. of Rock Island*, 219 Ill.2d 497 (2006)).

Whether conduct is extreme and outrageous is governed by an objective standard and on a case-by-case basis. *Id.* "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" won't suffice. *McGrath v. Fahey*, 126 Ill.2d 78, 86 (1988). "Beyond [that] well-established limitation, however, application of the 'outrageousness' requirement is necessarily difficult due to its vagueness." *Id.* But three factors can aid in the analysis. First, the bigger the power difference between the plaintiff and the defendant—which is to say, the more authority the defendant exercises over the plaintiff—the more likely the conduct will be found to be extreme and outrageous. *Id.* at 86–87; *Honaker*, 256 F.3d at 490–91. Second, if the defendant was pursuing a reasonable objective when he caused the injury, a court is less likely to find that the conduct is extreme and outrageous. *Honaker*, 256 F.3d at 491. And third, behavior that otherwise might be just "rude, abrasive or inconsiderate" can become extreme and outrageous if the plaintiff is "particularly susceptible" to emotional distress. *Id.* at 492.

24

There is a significant power difference between Arbuckle and the defendants. Some defendants have the power to find him guilty of prison disciplinary offenses (Best and Hudson); some can file disciplinary reports against him (Wilcox); some have the power to call for or refuse to call for medical help (Brown, Pork, Garrett, and Jones); some have the power to provide or refuse to provide medical help (Daniels); and others, in their managerial capacities, decide which policies govern Arbuckle's daily life (Pfister, Gomez, Jacobs, and Robinson).

As alleged, defendants were not pursuing reasonable objectives. Wilcox's objective, for instance, was to obtain false information about the cause of a prison assault. *See* [28] ¶ 7. Brown, Pork, Garrett, Jones, and Daniels had no objective; Arbuckle's suffering was not the unfortunate byproduct of them trying to accomplish something else. *See id.* ¶¶ 25–26.

There is no indication in the record that Arbuckle was "particularly susceptible" to emotional distress or, if he were, that defendants knew this. *Honaker*, 256 F.3d at 492. That is not to say Arbuckle isn't unusually susceptible. Suffering from panic attacks is an indication of such susceptibility. But Arbuckle does not address whether defendants knew of his susceptibility.

These three factors in isolation might suggest that the conduct at issue was extreme and outrageous. But this would miss the forest for the trees. On a more fundamental level, the conduct here doesn't rise to the level of extremity that appears in most cases involving intentional infliction of emotional distress. *See Honaker*, 256 F.3d at 492. It does not equate, for instance, to burning down someone's house to get

them to leave town, *id.*; offering an employee money in return for sexual favors and threatening to kill and rape her and challenge her child custody rights, *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 245–46; refusing, as a police officer on duty, to save a woman's children for fear of being held responsible for property damage to a door that had to be broken down, *Calumet City*, 161 Ill.2d at 394–95; or conspiring to murder one's wife, *Vance v. Chandler*, 231 Ill. App. 3d 747, 749–50 (1992). No doubt, retaliating against an inmate and denying him medical care for a panic attack are serious acts. But they do not sound in the tenor of extreme and outrageous conduct.

The claim is dismissed without prejudice.

### J. Conspiracy on State-Law Claims

To prove civil conspiracy under Illinois law, a plaintiff must allege 1) an agreement 2) to accomplish something illegal by concerted action, and 3) the commission of an illegal act by one of the participants in furtherance of the agreement. *See Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004). Arbuckle alleges that defendants conspired to engage in willful and wanton conduct and intentional infliction of emotional distress. *See* [28] ¶¶ 86–88. Because Arbuckle has failed to show that any defendant committed intentional infliction of emotional distress, he cannot show that they conspired to do so. And for the same reasons the complaint fails to allege an agreement to violate Arbuckle's constitutional rights, it fails to allege an agreement to commit willful and wanton conduct—there is no alleged meeting of

the minds to take concerted action against Arbuckle. The state-law conspiracy claims are dismissed without prejudice.[7]

## IV. Conclusion

The motion to dismiss, [54], is granted in part and denied in part. The following counts are dismissed with prejudice: Count 2 (Denial of Due Process) as to demotion to C-grade status, restrictions on visitation privileges, and commissary access; Count 4 (*Monell* claim); and Count 5 (Double Jeopardy). The following counts are dismissed without prejudice: Count 1 (Retaliation) as to Fredericks, Johnson, Best, Hudson, Pfister, Gomez, Brown, Pork, Garrett, Jones, Robinson, Jacobs, and Daniels; Count 2 (Denial of Due Process) as to being placed in segregation; Count 3 (Cruel and Unusual Punishment) as to Wilcox, Fredericks, Johnson, Best, Hudson, Pfister, Gomez, Robinson, and Jacobs; Count 6 (Failure to Intervene) as to Wilcox, Fredericks, Johnson, Best, Hudson, Pfister, Gomez, Robinson, and Jacobs; Counts 7 and 8 (Conspiracy); Count 9 (Negligent and Willful/Wanton Conduct) as to Fredericks, Johnson, Best, Hudson, Pfister, Gomez, Robinson, and Jacobs; and Count 10 (Intentional Infliction of Emotional Distress). The following claims survive and defendants shall answer the complaint as to those claims by December 7, 2021: Count

---

[7] Arbuckle's complaint includes factual allegations about an incident that occurred roughly two years after the main events. Arbuckle's mother visited him at Stateville. [28] ¶ 37. A prison employee took a photo of the two of them, but Arbuckle never received the photo. *Id.* ¶¶ 40–48. Arbuckle filed a grievance, but the counselor and the warden involved in handling the grievance failed to resolve it to Arbuckle's satisfaction. *Id.* This event has no connection to the claimed retaliation by Wilcox or cruel and unusual punishment and does not state a separate claim. Nothing about the alleged mishandling of the photo and grievance suggests that the counselor or warden took any steps to deter Arbuckle from protected activity, and no other constitutional claim is apparent from this incident.

1 (Retaliation) against Wilcox; Counts 3 and 6 (Cruel and Unusual Punishment and Failure to Intervene) against Daniels, Pork, Brown, Garrett, and Jones; and Count 9 (Negligent and Willful/Wanton Conduct) against Wilcox, Daniels, Pork, Brown, Garrett, and Jones. The Clerk shall terminate Fredericks, Johnson, Best, Hudson, Pfister, Gomez, Robinson, and Jacobs as parties in the caption. The parties shall file a status report with a proposal for a discovery schedule by December 14, 2021.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:   November 16, 2021